Troy A. Brenes, SBN 249776
Sarah J. Demers, SBN 330090
BRENES LAW GROUP, P.C.
100 Spectrum Center Drive, Ste. 330
Irvine, California 92618
Telephone: (949) 397-9360
Facsimile: (949) 607-4192
tbrenes@breneslawgroup.com
sdemers@breneslawgroup.com
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LINDA COOLEY,

               Plaintiff,

   vs.

C.R. BARD, INC., a foreign corporation, and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, and DOES 1 through 10, inclusive,

               Defendants.

Case No.: **'22 CV 1754 MMA KSC**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1.  **NEGLIGENCE**
2.  **STRICT LIABILITY FAILURE TO WARN**
3.  **STRICT LIABILITY MANUFACTURING DEFECT**
4.  **BREACH OF EXPRESS WARRANTY**
5.  **FRAUDULENT CONCEALMENT**

Plaintiff, LINDA COOLEY, by and through his undersigned attorneys, hereby sues Defendants C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., and DOES 1-10 (collectively "Bard"), and alleges as follows:

## PARTIES

1.    Plaintiff Linda Cooley at all times relevant to this action is and was a citizen of the State of California and resided in San Diego County.

- 1 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

2.      Defendant C.R. Bard, Inc. ("Bard") is a foreign corporation with its principal place of business and state of incorporation being in New Jersey. Bard is authorized to do business in California and said Defendant was doing business in California, and at all times relevant to this action, designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Bard Recovery Filter to be implanted in patients such as Plaintiff throughout the United States, including California.

3.      Defendant Bard Peripheral Vascular, Inc. ("BPV") is a foreign corporation with its principal place of business and state of incorporation being in Arizona. BPV is a wholly owned subsidiary corporation of Bard and is authorized to do business in California and said Defendant was doing business in California. At all times relevant to this action, BPV designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, distributed, and sold the Bard Recovery Filter to be implanted in patients such as the Plaintiff throughout the United States, including California.

4.      The true names and capacities of those Defendants designated as DOES 1 through 10, inclusive, whether individual, corporate, associate or otherwise are unknown to Plaintiff at the time of filing this Complaint, and Plaintiff, therefore has sued said Defendants by such fictitious names. When the true names, identities or capacities of said fictitiously designated defendants are ascertained, Plaintiff will seek leave of court to amend this complaint to insert the true names, identities, and/or capacities of DOE Defendants, together with the proper charging allegations.

- 2 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

5.      Plaintiff believes, and therefore alleges, that each unknown Doe Defendants 1-10 are, in some manner, legally responsible for the events and happenings set forth in this Complaint, and proximately caused injury and damages to Plaintiffs, as alleged herein.

6.      All references to "Bard" or "Defendants" hereafter shall refer to Defendants Bard, BPV and Does 1-10.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) (1) because the Plaintiff and the Defendants are citizens of different states, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), excluding interest and costs.

8.      Venue is proper in this Court, as the facts and circumstances leading to injuries occurred in San Diego County, California. Further, the Bard Recovery Filter that is the subject of this action was sold and purchased in San Diego County, California. Furthermore, the Defendant's herein were authorized to conduct business in the State of California and did conduct business in San Diego County, California.

## GENERAL FACTUAL ALLEGATIONS

### INFERIOR VENA CAVA FILTERS GENERALLY

9.      Inferior vena cava ("IVC") filters first came onto the market in the 1960's. Over the years, medical device manufacturers have introduced several different designs of IVC filters.

10.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

11.     An IVC filter is a device that is designed to filter or "catch" blood clots (called "thrombi") that travel from the lower portions of the body to the heart and lungs. IVC filters may be designed to be implanted, either permanently or temporarily, in the human body, more specifically, within the inferior vena cava.

12.     11. The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body. In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs. Often times, these thrombi develop in the deep leg veins. These thrombi are called "deep vein thrombosis" or "DVT". Once thrombi reach the lungs, they are considered "pulmonary emboli" or "PE". Pulmonary emboli present significant risks to human health.

13.     IVC filters have only been cleared by the FDA to prevent recurrent pulmonary embolism where anticoagulants are contraindicated or have failed. Thus, any use in a patient without a history of pulmonary embolism, is an off-label use.

14.     Of note, Bard's internal documents as well as recent medical literature establish that there is no proven benefit to these devices.

15.     Those people at risk for DVT/PE can undergo medical treatment to manage the risk. For example, a doctor may prescribe anticoagulation medications such as Heparin, Warfarin, or Lovenox to regulate the clotting factor of the blood. In some people who are at high risk for DVT/PE, or who are not candidates for anticoagulation medications may require the permanent or temporary implantation of an IVC filter to prevent thromboembolic events.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

16.     As indicated above, IVC filters have been on the market for decades. The first IVC filters marketed were permanent filters. These devices were designed to be implanted into the IVC permanently. These permanent filters have long-term follow-up data (of up to 20 years and longer) regarding their use. Beginning in 2003, manufacturers also began marketing what are known as optional or retrievable filters. These filters are marketed as being designed to be left in permanently or having the option to retrieve once the risk of pulmonary embolism has passed.

**THE RECOVERY FILTER®**

Simon Nitinol Filter and Bard's Reasoning For Retrievable Filters

17.     Bard has distributed and marketed the Simon Nitinol Filter in the United States since 1992. The Simon Nitinol Filter is a permanent IVC filter, which has an excellent safety record and is still sold by Bard today. Bard modified the design of the Simon Nitinol Filter to make a device that was supposed to be equally safe to leave in permanently and/or could be retrieved once the risk of pulmonary embolism had passed. The modified device was ultimately marketed as the Recovery® Filter System ("Recovery Filter").

18.     Bard's stated purpose in designing the Recovery Filter was to increase the overall size of the market for these devices through off-label promotion and to increase Bard's percentage of that market. Specifically, Bard marketed the device for patients that were at risk for DVT and PE but that had not actually ever had a pulmonary embolism as required by the FDA label. These included patients who

were immobilized for periods of time, e.g, orthopedic patients; bariatric patients, and cancer patients.

19.    Of note, prior to the Recovery filter being cleared for use by the FDA, Bard was losing market share in an IVC Filter market that was reported to be worth $100,000,000 in sales. In July 2001, Bard's overall market share was 16-17%. By March 2003, Bard's market share was down to 11-12%.

20.    Bard's marketing Manager explained Bard's marketing plan for the Recovery Filter in a March 28, 2003, Market Appraisal Memorandum. She wrote, "Users can be swayed by ease of use, low profile and aggressive marketing even in the absence of solid clinical history and in spite of negative clinical experience."

<u>FDA Clearance</u>

21.    In 2002, Bard and BPV submitted a notification to market the Recovery Filter System for the prevention of recurrent pulmonary embolism by placement in the inferior vena cava.

22.    On November 27, 2002, the FDA cleared the device for sale and use in the prevention of recurrent pulmonary embolism via permanent placement in the vena cava.

23.    In April 2003, Bard submitted a notification of intent to market and sell the Recovery Filter for the additional intended use of *optional retrieval* and Bard received FDA clearance to begin marketing the Recovery Filter as both a permanent and retrievable filter on or about July 25, 2003.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

24.    Ultimately, Bard's plan to promote its retrievable devices for off-label uses and for unproven benefits succeeded. By 2009, the overall market share for IVC filters had tripled, moreover, Bard's percentage of that market share has increased from 11-12% to 42%.

25.    Bard's marketing claims made to all physicians, included, that the Recovery Filter was safer than all previously available filters, including the Simon Nitinol Filter. As will be discussed below this claim was false.

<u>The Design Recovery Filter</u>

26.    The Recovery Filter is conical in shape and it consists of two (2) levels of six (6) radially distributed NITINOL struts that are designed to anchor the filter into the inferior vena cava and to catch any embolizing clots. There are six short struts, which are commonly referred to as the arms, and six long struts, which are commonly referred to as the legs. Each strut is held together by a single connection to a cap located at the top/apex of the device. According to the Patent filed for this device, the short struts are primarily for "centering" or "positioning" within the vena cava, and the long struts with attached hooks are designed to primarily prevent the device from migrating from "normal respiratory movement" or even massive pulmonary emboli.

27.    The Recovery Filter is inserted percutaneously by a deployment catheter that is guided by a physician through a blood vessel into the inferior vena cava. The Recovery Filter is designed to be retrieved in a similar fashion. The deployment device is part of the Recovery Filter System.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

28.     The Recovery Filter included several design changes from the Simon Nitinol Filter. These include, but are not limited to, the following:

    a.  decreasing the leg span of the device;

    b.  decreasing the hook diameter of each hook on the leg struts;

    c.  decreasing the radial force of the struts; and

    d.  changing the closed petal arm strut design to an open arm strut design.

<u>Bard's Design Efforts Were Inadequate</u>

29.     Each of the design changes referenced above substantially reduced the Recovery Filter's stability and structural integrity.

30.     However, because Bard failed to conduct adequate testing and research to understand the anatomy of where the device would be placed and what forces it would be exposed to when used in a reasonably foreseeable manner, Defendants failed to realize that these design changes would result in the device not being reasonably safe for user needs.

31.     In a 2009 Bard IVC Filter franchise review, Bard's Filter Franchise Team admitted that Bard's weaknesses have been:

    a.  Lack of thorough understanding dynamics of caval anatomy – impacting testing methods;

    b.  We have a historical reactive/evolution design mindset;

    c.  Product complications – forcing focus on reactive designing;

    d.  Limited understanding of user needs.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

32.     Due to Bard's lack of understanding of the anatomy of the vena cava and the forces the device would be exposed to once implanted, Bard set design specifications that were not clinically relevant and did not account for the forces these devices would actually see when implanted in the human body. For instance, Bard's decision to set the minimum safety standard regarding migration resistance at 50 mmHg reflected a complete lack of understanding of the forces this device could be exposed to once implanted.

33.     Bard also failed to test the device under reasonably foreseeable conditions that the device could be exposed to when used in an intended and expected manner. Among other things, Bard knew that these devices could be placed in appropriately sized vena cavas that subsequently expanded beyond 28 mm in diameter. Bard knew that this decreased migration resistance if the device was challenged by a clot and could lead to migration if the vena cava expanded beyond the leg span of the filter, such that the hooks were no longer in touch with the vena cava walls. Yet Bard chose not to test the device to simulate how it would perform if caval distension were to occur. Bard also failed to test the device to determine how it would perform if tilted, fractured, or perforating the vena cava in respect to stability and structural integrity. Bard also failed to test the device for fracture resistance under reasonably foreseeable conditions.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

<u>Pre-Market Expectations</u>

34.     Prior to introducing the Recovery Filter to market, Bard expected that a properly placed filter would not migrate or fracture from in vivo forces. Bard's internal documents repeatedly support this point:

a.  Bard filed patents for its retrievable filters, which state "An elastic hook is formed on the free end of an appendage to pierce the vessel wall and insure that the filter does not migrate in response to normal respiratory functions or in the event of a massive pulmonary embolism."),

b.  Bard's Product Performance Specifications for its retrievable filters state that the "user need" that must be met is a device that must not migrate.

c.  Bard's pre-market design and testing documents state that if a clot challenges a filter "pressure below the filter increases significantly and tends to drive the filter toward the heart" and that "the device must not migrate in response to such a challenge."

d.  In a June 2004 Health Hazard Evaluation, Bard's Medical Director states that clot induced migrations are a malfunction of the device and a failure to carry out its intended function.

e.  Bard's own quality engineers working on the retrievable filter projects admit that if one of its filters is driven into the heart by a clot challenge, then the device failed to perform as intended.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

f. In 2004, Bard conducted a physician focus group regarding what were the expected complications from IVC filters. The physicians reported that an IVC Filter must not migrate no matter how big a clot is.

g. Bard's pre-market finite element analysis regarding fatigue resistance predicted fractures would never occur from in vivo forces.

35. Bard and physicians further expected that Bard's retrievable filters would perform at least as safely and effectively as Bard's permanent filter. For example:

a. BPV's Vice-President of Quality Assurance, Doug Uelmen and C.R. Bard, Inc.'s Medical Director, Dr. Ciavarella, both admitted that a device that fails to perform as safely and effectively as a predicate device is adulterated and misbranded under federal law and company must stop selling it.

b. Bard marketed the Recovery Filter as being substantially safer than previous IVC filters, including the Simon Nitinol Filter.

c. In 2004, Bard conducted a physician focus group regarding what were the expected complications from IVC filters. The physicians reported that "A retrievable filter is expected to perform just as well as a permanent filter."

Bard's Post-Market Surveillance Revealed Recovery Filter Did Not Perform as Expected

36. Once the Recovery Filter was released to market, Bard became aware from reported complaints, its own investigations, and epidemiological studies that the

- 11 -
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

changes made to the Simon Nitinol Filter when designing the Recovery Filters had the unintended result of substantially reducing the stability and structural integrity of the device.

37.    Thus, even when properly placed, the Recovery Filter would move, fracture, and could perforate the vena cava when exposed to normal and expected in vivo forces. These failures resulted in numerous deaths and other serious injuries.

38.    Moreover, Bard was aware that these failures and resulting injuries were far more likely to occur with the Recovery Filter versus other available IVC Filters. For instance:

a.  Multiple studies have reported Bard's Recovery Filter to have a fracture and migration rate ranging from 21% to 31.7%.

b.  In June 2004, Bard's divisional head of Quality Assurance, Doug Uelmen, admitted: "Bard has been in the permanent filter market for 10 years (SNF). We have had a great deal of experience with a traditional patient base, experiencing a very low and unremarkable adverse event rate. We have now moved into the optional filter market with RNF and have experienced increased failures."

c.  By July 2004, Bard was aware that the Recovery Filter had a reported fracture rate that was 28 times higher than all other devices

d.  In December 2004, Bard performed a risk assessment of the Recovery Filter, which analyzed reported failure rates, and concluded: "Reports of death, filter migration (movement), IVC perforation, and filter fracture

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

associated with Recovery filter were seen in the MAUDE database at reporting rates that were 4.6, 4.4, 4.1, and 5.3 higher, respectively, than reporting rate for all other filters. These differences were all statistically significant, Recovery's reporting rates for all adverse events, filter fracture, filter migration, and filter migration deaths were found to be significantly higher than those for other removable filters." Dr. Ciavarella, Bard's Medical Director, concluded that this risk (substantially higher reported failure rates) was not known or obvious to consumers, and that Bard should consider providing a warning regarding the increased reporting rate.

    e.  By December 2004, BPV's Vice President of Quality Assurance, Doug Uelmen, admitted that according to Bard's own policy and procedure for when devices should be recalled, the Recovery filter was considered unreasonably dangerous for human health and required product correction.

39.    These failures are attributable, in part, to the fact that the Recovery Filter was designed to be unable to withstand the normal anatomical and physiological loading cycles exerted in vivo.

40.    In addition to design defects, the Recovery Filter suffers from manufacturing defects. These manufacturing defects include, but are not limited to, the absence of electropolishing and the existence of "draw markings" and circumferential grinding markings on the exterior of the surface of the device. The

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

presence of these draw markings and/or circumferential grinding markings further compromises the structural integrity of the device while *in vivo*. In particular, the Recovery Filter is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device. Put simply, the Recovery Filter is not of sufficient strength to withstand normal placement within the human body. The presence of the aforementioned exterior manufacturing defects makes the device even more susceptible to failure.

<u>Bard's Design Review Migration Failures</u>

41.     In late 2003, as migrations failures for the Recovery Filter continued to mount, Bard convened a group to reexamine the adequacy of the design of the Recovery Filter as it relates to its ability to remain stable after implantation. The group established a number of action items, including the following: an investigation into what the minimum migration resistance specification of 50 mmHg had been based on, testing comparing the migration resistance of the Recovery Filter to other available filters, and testing comparing radial force difference between the range of available devices.

42.     This design review revealed that the minimum safety migration resistance specification was unsupported and had been set artificially low. Bard developed this critical safety standard based on undocumented informal estimates obtained from unidentified physicians regarding the highest pressure below a filter that could be seen in the vena cava (35 mmHg). Bard then tested the device in three (3) sheep and claimed that the test results confirmed that that 35 mmHg was the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

highest pressure that could ever be seen in the vena cava under worst case conditions. Bard then added a safety factor of 15 mmHg, and concluded that its filters would never migrate. However, the test results from the sheep testing actually show pressure levels well above 50 mmHg.

43.    Further, Bard's own investigations concluded that multiple properly placed Recovery Filters migrated and caused death because the filters lacked adequate strength to resist clot challenges and/or lacked an adequate margin of safety to accommodate postiplacement distention of the vena cava. Thus, further confirming that the safety specification of 50 mmHg was inadequate and that it's testing, which predicted no migration failures, did not accurately reflect real world conditions.

44.    As part of its design review in early 2004, Bard also spoke with its two long time physician consultants, Drs. Venbrux and Kaufman. They warned Bard that their input on the migration resistance specification had just been an "estimate" and that Bard needed to consider revising the migration resistance specification from 50 mmHg to 140 mmHg. They further warned Bard that the Recovery Filter was a "wimpy" filter and its radial force also needed to be increased to ensure stability.

45.    The design review also revealed that the Recovery Filter had migration resistance values that were far below most other filters, including the Simon Nitinol Filter. Bard's internal records reveal that this was a known contributing factor to why the Bard anchoring mechanism was insufficient to assure stability.

46.    Bard knew that caval distension (expansion of the vena cava diameter beyond the size at placement) could occur from multiple factors. These factors

included: anesthesia, hydration following medical procedure such as bariatric procedures, exertion from exercise, coughing, straining during bowel movements. However, Bard to date has failed to make any efforts to determine the size of vena cava distension that can occur.

<u>Bard Conducts Silent Recall of Recovery Filter</u>

47.    In or around April 2004 Bard, without notifying consumers of the design and manufacturing flaws inherent in the Recovery Filter, began redesigning the Recovery Filter in an attempt to correct those flaws. The redesigned filter is known as the G2 Filter, which stands for second generation Recovery Filter. Once Bard began marketing and selling the redesigned product in approximately August 2005, Bard quietly stopped selling the Recovery Filter. Of note, however, Bard continued to market the Recovery Filter as being safer and more effective than all prior filters up until the day the Recovery Filter was removed from the market. Moreover, Bard never issued a recall for the Recovery Filter, which had a three (3) year shelf-life.

48.    Bard allowed hospitals to use the remaining units of the Bard Recovery Filter they had in stock. Because of Bard's actions, Plaintiff was implanted with the Recovery Filter on October 5, 2005 – six months after Bard stopped manufacturing the device.

<u>G2, G2 Express, Eclipse, and Meridian Filters</u>

49.    Bard would attempt to correct the dangerous flaws of the Recovery Filter with the next four IVC models it released: the G2, the G2 Express, the Eclipse, and the Meridian Filters.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

50.    The G2 was cleared for marketing through the 510k process on August 29, 2005. Despite Bard's representations in marketing materials that the G2 filter had "enhanced fracture resistance," "improved centering," and "increased migration resistance" compared to previous filters, the G2 Filter suffered from the same shortcomings as the Recovery Filter because it had insufficient integrity and strength to withstand normal *in vivo* body stresses within the human body and was susceptible to breakage and migration.

51.    On July 30, 2008, Bard obtained clearance to begin marketing the G2 Express® Filter (G2 Express) via the 510k process. This filter is identical in design to the G2 Filter other than a hook at the top of the device, which allows it to be retrieved by snares, as well as Bard's Recovery Cone. Post-market performance of the device confirmed the G2 Express Filter performed no different than the G2 Filter.

52.    On January 14, 2010, Bard obtained clearance to begin marketing the Eclipse® Filter ("Eclipse Filter") via the 510k process. Bard represented that the only change "was an improvement of the surface finish of the filter raw material wire by electropolishing the wire prior to forming the filter." This device did not incorporate any design changes to address the known stability, perforation and structural integrity design problems experienced by the device.

53.    Both the G2 Express and the Eclipse Filter continued to experience the unacceptably high failure modes and patient injuries originally introduced with the design of the Recovery Filter.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

54. Bard obtained clearance from the FDA to market the Meridian Filter in August 2011. Bard represented that design modifications made to the Meridian filter would prevent it from migrating, tilting, perforating the vena cava, or fracturing. However, based on internal testing (inadequate as it was) as well as early post-market surveillance data, the Meridian Filter continued to suffer from inadequate design and manufacturing defects as it predecessors.

55. Bard obtained 510k clearance to begin marketing the Denali Filter on April 5, 2013. The Denali Filter purported to incorporate design changes to fix design defects in the G2, G2 Express, Express, and Meridian Filters regarding the devices' inadequate stability, structural integrity and propensity to perforate the vena cava.

56. Even after Bard released the Denali Filter, it failed to recall the older generation devices, including the Recovery Filter, and/or to warn consumers about the increased risk posed by these devices. Instead, Bard conducted another silent recall. It stopped manufacturing the older device, sold remaining units, and allowed hospitals to use up units already on their shelves.

FDA WARNING LETTER

57. On July 13, 2015, the FDA issued a warning letter notifying Bard that its IVC Filters were adulterated and misbranded under federal law.

58. The FDA notified Bard that its IVC Filters are adulterated and misbranded because the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at

Title 21, Code of Federal Regulations (CFR), Section 820, and that Bard failed to comply with adverse event reporting requirements of 21 C.F.R. 803.

59.    The FDA cited numerous specific violations, including the failure to establish and maintain procedures to ensure that product complaints are adequately investigated and reported, and a consistent pattern of Bard underreporting the severity of injuries caused by device failures and failing to report device malfunctions all together. For instance, the FDA cites numerous examples of Bard reporting G2, and G2 Express and Eclipse Filter failures resulting in death and other serious injuries as if there was no patient injury involved. Other examples of Bard's failures include the FDA finding Bard failed to establish and maintain a procedure to ensure that the toxic acids and chemicals used in the manufacture of its filters were reduced to acceptable levels prior to distribution.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

60.    On or about October 5, 2005, Plaintiff underwent placement of a Bard Recovery Filter at Grossmont Hospital in La Mesa, California. On or about November 18, 2020, she underwent a chest X-ray because she had been experiencing shortness of breath. The chest x-ray revealed a "linear density projecting over the right hilum measuring 22 mm in length…" The "linear density" was determined to be a broken and displaced piece of the Bard Recovery Filter which had migrated through Plaintiff's heart and had become lodged in her lung. The fragmented device has caused and will continue to cause Plaintiff pain and suffering, loss of ability to enjoy life, and economic loss.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## FRAUDULENT CONCEALMENT

61.     Any applicable statutes of limitation have been tolled by the knowing and active concealment and denial of material facts known by Bard when they had a duty to disclose those facts. They have kept Plaintiff and her physicians ignorant of vital information essential to the pursuit of his claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's part in filing on his causes of action. Bard's fraudulent concealment did result in such delay.

62.     Bard is estopped from relying on the statute of limitations defense because Bard failed to timely disclose, among other things, facts evidencing the defective and unreasonably dangerous nature of the Recovery Filter.

63.     Bard was under a continuing duty to disclose the true character, quality and nature of the device that was implanted in the Plaintiff, but instead they concealed them. Bard's conduct, as described in this Complaint, amounts to conduct purposely committed, which Bard must have realized was dangerous, needlessly reckless, without regard to the consequences or the rights and safety of Plaintiff.

## CORPORATE/VICARIOUS LIABILITY

64.     At all times herein mentioned, the Bard Defendants were the agents, servants, partners, co-conspirators and/or joint venturers of each of the other and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

65.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between the Bard Defendants such that any individuality and separateness between these Bard Defendants has ceased and these Defendants are the alter ego of the other and exerted control over one another. Adherence to the fiction of the separate existence of the Bard Defendants as entities distinct from each other will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

66.     At all times herein mentioned, the Bard Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff. As such, each Bard Defendant is individually, as well as jointly and severally, liable to the Plaintiff for Plaintiff's damages.

67.     At all times herein mentioned, the officers and/or directors of the Bard Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of the Recovery Filter, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiff.

# COUNT I: NEGLIGENCE

68.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

69.     At all times relevant to this cause of action, the Bard Defendants were in the business of designing, developing, setting specifications, manufacturing, marketing, selling, and distributing the Bard Recovery Filter.

70.     Bard designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the Bard Recovery Filter that was implanted in Plaintiff.

71.     Bard had a duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the Bard Recovery Filter so as to avoid exposing others to foreseeable and unreasonable risks of harm.

72.     Bard knew or reasonably should have known that the Bard Recovery Filter was dangerous or was likely to be dangerous when used in its intended or reasonably foreseeable manner.

73.     At the time of manufacture and sale of the Bard Recovery Filter, Bard knew or should have known that the Bard Recovery Filter:

    a.  Was designed and manufactured in such a manner so as to present an unreasonable risk of fracture of portions of the device;

    b.  Was designed and manufactured so as to present an unreasonable risk of migration of the device and/or portions of the device; and/or

c. Was designed and manufactured so as to present a unreasonable risk of the device tilting and/or perforating the vena cava wall and/or could not be removed percutaneously;

d. Was designed and manufactured to have unreasonable and insufficient strength or structural integrity to withstand normal placement within the human body.

74.     At the time of manufacture and sale of the Bard Recovery Filter, Bard knew or should have known that using the Bard Recovery Filter as intended or in a reasonably foreseeable manner created a significant risk of a patient suffering and severe health side effects including, but not limited to: hemorrhage; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; perforations of tissue, vessels and organs; and other severe personal injuries and diseases, which are permanent in nature, including, but not limited to, death, physical pain and mental anguish, scarring and disfigurement, diminished enjoyment of life, continued medical care and treatment due to chronic injuries/illness proximately caused by the device; and the continued risk of requiring additional medical and surgical procedures including general anesthesia, with attendant risk of life threatening complications.

75.     Bard knew or reasonably should have known that consumers of the Bard Recovery Filter would not realize the danger associated with using the device in its intended use and/or in a reasonably foreseeable manner.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

76.     Bard breached their to duty to exercise reasonable and prudent care in the development, testing, design, manufacture, inspection, marketing, labeling, promotion, distribution and sale of the Bard Recovery Filter in, among other ways, the following acts and omissions:

a.  Designing and distributing a product which they knew or should have known the likelihood and severity of potential harm from the product exceeded the burden of taking safety measures to reduce or avoid harm;

b.  Designing and distributing a product which they knew or should have known the likelihood and severity of potential harm from the product exceeded the likelihood of potential harm from other devices available for the same purpose;

c.  Failing to use reasonable care in manufacturing the product and producing a product that differed from their design or specifications or from other typical units from the same production line;

d.  Failing to use reasonable care to warn or instruct, including pre and post-sale, Plaintiff, Plaintiff's physicians, or the general health care community about the Bard Recovery Filter's substantially dangerous condition or about facts making the product likely to be dangerous;

e.  Failing to perform reasonable pre and post-market testing of the Bard Recovery Filter to determine whether or not the product was safe for its intended use;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

f.  Failing to provide adequate instructions, guidelines, and safety precautions, including pre and post-sale, to those persons to whom it was reasonably foreseeable would prescribe, use, and implant the Bard Recovery Filter;

g.  Advertising, marketing and recommending the use of the Bard Recovery Filter, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with and inherent in the use of the device;

h.  Representing that the Bard Recovery Filter was safe for its intended use when, in fact, Bard knew or should have known the product was not safe for its intended purpose;

i.  Continuing to manufacture and sell the Bard Recovery Filter with the knowledge that the product was dangerous and not reasonably safe, and failing to comply with good manufacturing regulations;

j.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of the Bard Recovery Filter so as to avoid the risk of serious harm associated with the use of these filter systems;

k.  Advertising, marketing, promoting and selling Recovery Filter for uses other than as approved and indicated in the product's label;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

l.   Failing to establish an adequate quality assurance program used in the manufacturing of the Bard Recovery Filter;

m.  Failing to establish and maintain an adequate post-market surveillance program;

n.   Failing to remove the Bard Recovery Filter from the market, and

o.   By marketing the device as retrievable when it knew there was no device cleared as safe and effective to retrieve the device by the FDA.

A reasonable manufacturer, distributor, or seller under the same or similar circumstances would not have engaged in the before-mentioned acts and omissions.

77.     As a direct and proximate result of the foregoing negligent acts and omissions by the Bard Defendants, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device. Plaintiff is also exposed to the risk of requiring additional medical and surgical procedures, including risk of life-threatening complications and ongoing medical care to monitor the fractured Bard Recovery Filter pieces that have migrated throughout her body to ensure that they do not cause additional or further injury.

## COUNT II – STRICT LIABILITY FAILURE TO WARN

78.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

79.     Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Bard Recovery Filter, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers.

80.     At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, Defendants knew or should have known the device presented an unreasonable danger to users of the product when put to its intended and reasonably anticipated use.

81.     Specifically, Bard knew or should have known at the time they manufactured, labeled, distributed and sold the Bard Recovery Filter that it posed a significantly higher risk of fracture, migration, tilting, and perforation of the vena cava wall than other similar devices, including Bard's own Simon Nitinol Filter. Bard knew or should have known these complications were likely to result in serious injuries including death for the consumers of the Bard Recovery Filter.

82.     Yet, Bard chose to falsely market the Bard Recovery Filter as being safer and more effective in respect to stability and structural integrity than its previous devices, including the Simon Nitinol Filter.

83.     Bard further failed to accurately disclose the prevalence of such failures and resulting injuries.

84.     Bard also downplayed the seriousness of the device failures and resulting injuries associated with the Bard Recovery Filter by reporting that the failures had only been "reported" and that some of these were allegedly reported in association with patient death. The truth, however, was that Bard knew these failures had been confirmed and that these events had also been confirmed to have directly caused patient death.

85.     The FDA has recently found that Bard violated FDA minimum safety guidelines by misreporting numerous device failures associated with G2 and G2 Express Filters. Specifically, the FDA sampled approximately 42 complaint files during an inspection. Of those complaint files, the FDA found that Bard had reported numerous device failures resulting in serious patient injuries, including death, as if no injury had occurred. The FDA further found that Bard failed to report numerous device malfunctions that could have caused serious injury or death as required.

86.     Bard failed to reveal that it knew internally that there were design problems with the Recovery Filter and that new safer devices were about to be released.

87.     The foreseeable risks of harm from the Bard Recovery Filter could have been reduced or avoided by providing reasonable instructions and/or warnings and the failure to provide those instructions or warnings makes the Bard Recovery Filter unreasonably dangerous and renders the device defective.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

88.    No health care provider, including Plaintiff's, or patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers and/or ultimate users of the device.

89.    The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

90.    Plaintiff and Plaintiff's health care providers used the device in a normal, customary, intended, and foreseeable manner, namely as a surgically implanted device used to prevent pulmonary embolisms.

91.    Therefore, the Bard Recovery Filter implanted in Plaintiff was defective and unreasonably dangerous at the time of release into the stream of commerce due to inadequate warnings, labeling and/or instructions accompanying the product.

92.    The Bard Recovery Filter implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed, and sold by Defendants.

93.    As a direct and proximate result of Defendants' lack of sufficient warning and/or instructions, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## COUNT III: STRICT LIABILITY MANUFACTURING DEFECT

94.     Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

95.     Bard designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the Bard Recovery Filter that was implanted into Plaintiff. The Bard Recovery Filter was unreasonably dangerous because of a manufacturing defect in that it was different from its intended design and failed to perform as safely as the intended design would have performed.

96.     The Bard Recovery Filter implanted in Plaintiff was in a condition unreasonably dangerous and the filter was expected to and did reach the Plaintiff and/or her physicians without substantial change affecting the filter.

97.     Plaintiff and Plaintiff's health care providers used the device in a manner that was reasonably foreseeable to Bard.

98.     As a result of this condition, the product injured Plaintiff and failed to perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner.

99.     As a direct and proximate result of the Bard Recovery Filter's manufacturing defect, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## COUNT IV: BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY

100.   Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

101.   At all times relevant to this action, Bard designed, researched, developed, manufactured, tested, labeled, inspected, advertised, promoted, marketed, sold, and distributed into the stream of commerce the Bard Recovery Filter for use as a surgically implanted device to prevent pulmonary embolisms and for uses other than as approved and indicated in the product's instructions, warnings, and labels.

102.   The Bard Recovery Filter System did not conform to the express representations made by Defendants through sales representatives, consultants, printed materials, and other advertising and marketing efforts. Plaintiff and her physicians relied on these express representations in the purchase, use and implantation of the Bard Recovery Filter in the Plaintiff.

103.   Bard knew of the intended and reasonably foreseeable use of the Bard Recovery Filter, at the time they marketed, sold, and distributed the product for use by Plaintiff, and warranted the product to be of merchantable quality, and safe and fit for its intended use.

104.   Bard represented and warranted to the healthcare community, Plaintiff and Plaintiff's health care providers, that the Bard Recovery Filter was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

105.   The representations and warranties made by Bard were false, misleading, and inaccurate because the Bard Recovery Filter was defective and unreasonably dangerous, and the device was not of merchantable quality when used in its intended and/or reasonably foreseeable manner. At the time of Plaintiff's purchase of the Bard Recovery Filter, Bard knew the device was designed in such a way that it would not perform as intended and expected in respect to stability and structural integrity and that it suffered device failures at rates far higher than other available devices.

106.   Plaintiff and Plaintiff's health care providers reasonably relied on the superior skill and judgment of Bard as the designers, researchers and manufacturers of the product, as to whether Bard Recovery Filter was of merchantable quality and safe and fit for its intended use, and also relied on the warranty of merchantability and fitness for the particular use and purpose for which the Bard Recovery Filter was manufactured and sold.

107.   Bard placed the Bard Recovery Filter into the stream of commerce in a defective, unsafe, and unreasonably dangerous condition, and the product was expected to and did reach Plaintiff without substantial change in the condition in which the Bard Recovery Filter was manufactured and sold.

108.   Bard breached their warranty because their Bard Recovery Filter was not fit for its intended use and purpose.

109.   As a proximate result of the Bard Defendants breach of their implied warranties, Plaintiff has suffered and will continue to suffer significant medical

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

expenses, pain and suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

## COUNT V: FRAUDLENT CONCEALMENT

110.   Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

111.   At all times relevant to this Count, and as detailed *supra*, Defendants fraudulently concealed material information concerning the Bard Recovery Filter from Plaintiff, Plaintiff's health care providers, and the general medical community relating to the safety and efficacy of these devices.

112.   Defendants marketed the Recovery Filter as being safer and less likely to fracture, migrate, or tilt than other devices, including the Simon Nitinol Filter. Defendants concealed that they were aware of information suggesting the Recovery Filter was substantially more likely to fracture, migrate, tilt, or perforate the vena cava and other internal organs and cause injuries, than the other available IVC Filters.

113.   Defendants were also aware at the time Plaintiff's filter was distributed that electropolishing reduced the risk of fracture and that it was industry standard for NITINOL medical devices. Yet, Defendants concealed that the Recovery Filter was not electropolished from Plaintiff and her physicians.

114.   Defendants were also aware that numerous deaths and serious injuries had been confirmed to have been caused by failures of Bard Recovery filters. Yet, Defendants concealed this information from Plaintiff and her physicians. Instead,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Defendants only warned that people with filters had been reported to die and suffer serious injuries but not that any of these events were confirmed to have been caused by Bard's filters.

115.   Bard also concealed information that it knew internally there were design issues relating to stability and structural integrity with the Recovery Filter was creating quality problems and device failures once implanted and that Bard was about to introduce a new device that it claimed addressed these problems.

116.   Defendants also marketed the filter to the medical community and Plaintiff's health care providers as if the device was safe and effective for the off-label uses for which it was used in this case. Defendants concealed from consumers that these were off-label uses that had never been cleared by the FDA.

117.   Plaintiff and Plaintiff's health care providers could not reasonably have discovered the claims made herein until, at the earliest, the device was discovered to have broken and migrated through Plaintiff's heart into her lung.

118.   The Defendants are and were under a continuing duty to disclose the true character, quality and nature of the device implanted in Plaintiff, but instead they concealed them. Defendants' conduct, as described in this complaint, amounts to conduct purposely committed, which Defendants must have realized was dangerous, heedless, and reckless, without regard to the consequences or the rights and safety of Plaintiff.

119.   As a proximate result of Defendants fraudulent concealment, Plaintiff has suffered and will continue to suffer significant medical expenses, pain and

suffering, mental anguish, loss of enjoyment of life, and other losses proximately caused by the device, in an amount to be determined at trial.

## PUNITIVE DAMAGES AS TO BARD

120.   Plaintiff realleges and incorporates by reference every allegation of this Complaint as if each were set forth fully and completely herein and additionally or in the alternative, if same be necessary, allege as follows:

121.   Plaintiff is entitled to an award of punitive and exemplary damages based upon Bard's intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare.

122.   Bard had knowledge of, and was in possession of evidence demonstrating that, the Bard Recovery Filter was defective and unreasonably dangerous and had a substantially higher failure rate than did other similar devices on the market. Yet, Bard failed to:

1. Inform or warn Plaintiff or her health care providers of the dangers;

2. To establish and maintain an adequate quality and post-market surveillance system; and

3. Recall the Bard Recovery Filter from the market.

123.   Bard acted to serve their own interests and having reasons to know and consciously disregarding the substantial risk that their product might kill or significantly harm patients, or significantly injure the rights of others, and

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

consciously pursued a course of conduct knowing that such conduct created a substantial risk of significant harm to other persons.

124.   As a direct, proximate, and legal result of Bard's acts and omissions a described herein, and Plaintiff implantation with Bard's defective product, Plaintiff has suffered and will continue to suffer serious physical injuries, economic loss, loss of enjoyment of life, disability, and other losses, in an amount to be determined at trial.

## PRAYER FOR DAMAGES

125.   WHEREFORE, Plaintiff demands judgment against Defendants under all causes of action for:

    a.   General (non-economic) damages, including, without limitation, past and future mental anguish and physical suffering; loss of enjoyment of life, and other consequential damages as allowed by law and in amount to be determined by the jury;

    b.   Special (economic) damages, including, without limitation, medical expenses;

    c.   Costs of this action;

    d.   Prejudgment interest as allowed by law;

    e.   Post-judgment interest at the highest applicable statutory or common law rate from the date of judgment until satisfaction of judgment;

    f.   Punitive Damages; and

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1       g.  Such other additional and further relief as Plaintiff may be entitled to in

2   law or in equity.

3                           **DEMAND FOR JURY TRIAL**

4   Plaintiff demands trial by jury on all triable issues.

5

6

7   Dated: November 9, 2022                Respectfully Submitted,

8

9                                       Troy A. Brenes

10                                      Sarah J. Demers

11                                      BRENES LAW GROUP, P.C.

12                                      100 Spectrum Center Drive, Ste. 330

                                    Irvine, California 92618

13                                      P: 949.397.9360

14                                      tbrenes@breneslawgroup.com

                                    sdemers@breneslawgroup.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL